UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------- x

UNITED STATES OF AMERICA :

- v - : 24 Cr. 12 (VM)

VICTOR MONTANEZ, :

Defendant. :

---------------------------------------------------- x

**SENTENCING MEMORANDUM ON BEHALF OF VICTOR MONTANEZ**

TAMARA GIWA, ESQ.
Federal Defenders of New York, Inc.
Attorney for Defendant
VICTOR MONTANEZ
52 Duane Street - 10th Floor
New York, New York 10007
Tel.: (646) 588-8317

MARTIN S. COHEN
*Of Counsel*

TO: JAY CLAYTON, ESQ.
United States Attorney
Southern District of New York
One. St. Andrew's Plaza
New York, New York 10007
Attn: DOMINIC GENTILE, ESQ.
Assistant United States Attorney

Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street, 10th Floor
New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director*

Jennifer L. Brown
*Attorney-in-Charge*

January 21, 2026

*By ECF and e-mail*

Honorable Victor Marerro
United States District Judge
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *United States v. Victor Montanez*, 24 Cr. 12 (VM)

Dear Judge Marrero:

Victor Montanez recognizes how serious and extraordinarily reckless his conduct was. The fact that he has no recollection of the events surrounding this offense does not excuse the conduct, nor does Mr. Montanez's serious mental health, cognitive, and medical challenges. These mitigating factors, however, along with the changes and maturation Mr. Montanez has experienced during this incarceration, provide essential context in determining the appropriate sentence here.

Over the past *27 months*, spent either at the MDC or handcuffed to a hospital bed, Mr. Montanez has thought long and hard about his conduct, the harm he caused, his painful and prolonged separation from his daughter and family, and his own mortality.

In around March 2024, Mr. Montanez began experiencing agonizing pain, and was losing an enormous amount of weight. The BOP did not act with the alacrity that Mr. Montanez's condition required, and by the time he was diagnosed with non-Hodgkin lymphoma, we were told that the condition was likely terminal. Fortunately, Mr. Montanez was eventually brought to Mt. Sinai hospital. There, he received aggressive chemotherapy and other treatments, and his cancer slowly improved. (After being returned to the MDC in November 2024, his cancer returned, and Mr. Montanez was again hospitalized at Mount Sinai for an additional six months.) As of this writing, Mr. Montanez's cancer is currently in remission, but it could return at any time, and his long-term prognosis is uncertain.

Over the two years that Mr. Montanez has struggled with this illness, he has matured and changed. As Victor explains in his letter to the Court, "I can now say that I look at life totally differently." *See* Exhibit A. And as his mother writes, "Today, the man before you is not the same young man who made mistakes in his past." *See* letter of Rebecca Rodriguez, attached as Exhibit B. Given the unique characteristics of this offense and this defendant, a sentence of 40 months' imprisonment will best satisfy *all* the purposes of sentencing.

Re: *United States v. Victor Montanez*, 24 Cr. 12 (VM)

## I. The standard.

The overarching command of Section 3553(a) is that sentences should be "sufficient, but not greater than necessary" to achieve the basic goals of retribution, deterrence and rehabilitation. To arrive at such a sentence, district courts are directed to consider: (1) the nature and circumstances of the offense and the history and characteristics of the individual; (2) the need for the sentence imposed to provide just punishment, deterrence, and needed educational and vocational training; (3) the kinds of sentences available; (4) the Guidelines-range and any pertinent policy statements issued by the Sentencing Commission; (5) the need to avoid unwarranted sentence disparities among similarly situated defendants; and (6) the need to provide restitution. *See* 18 U.S.C. § 3553(a).

The Guidelines range is but one of these factors that a court must consider. *See generally United States v. Booker*, 543 U.S. 220 (2005). "The Guidelines are not only *not mandatory* on sentencing courts; they are also not to be *presumed* reasonable." *Nelson v. United States*, 129 S. Ct. 890, 892 (2009) (emphasis in original). In every case, the sentencing court "must make an individual assessment based on the facts presented." *Gall v. United States*, 128 S.Ct. 586, 597 (2007). [1]

## II. The sentencing factors support the imposition of a sentence of no more than 40 months' imprisonment.

### A. Mr. Montanez background and characteristics support the requested sentence.

Victor Montanez has had a difficult life, marked by congenital disorders, undiagnosed and untreated mental health disorders, cognitive issues, and trauma.

Victor was born in 1990. At the time, his mother was actively using drugs, as well as suffering from significant mental health and medical issues. [redacted] Victor had minimal contact with his father, who was also a drug addict. Victor was raised by his grandmother, who was raising seven other grandchildren, including Rebecca Rodriguez. *See* letter of Ms. Rodriguez, attached as Exhibit B.

[1] The Presentence Report provides for a Guidelines range of 92 to 115 months, based on an offense level of 26 and a Criminal History Category of IV. *See* PSR at 22. As discussed within, we disagree with that calculation. (We timely objected to the calculation as set forth in the PSR, but our objections were not including in the final report.)

Re: *United States v. Victor Montanez*, 24 Cr. 12 (VM)

While still a teenager, Ms. Rodriguez took on the responsibility of helping to raise Victor, [redacted] Ms. Rodriguez continues to be a loving, supportive presence in his life, and she did all she could to provide Victor with the stability that he needed. She writes: "Victor was a happy child – always smiling, joking, listening to music, and drawing. He is an amazing artist with a natural gift." *See id.*

But Victor struggled as he got older. As his mother writes, Victor "experienced many challenges – medically, mentally and emotionally. He was diagnosed with ADHD, seizures and a host of other medical concerns. He endured the loss of our grandmother and grandfather, who were the only parental figures he truly knew, along with the loss and absence of [redacted] Additionally, Victor struggled with an undiagnosed mental health concern, which affected his behavior and emotional development." *Id.*; *see also* letter of Jessical Montanez ("Victor has overcome many challenges since childhood. He suffered from serious health issues as a young boy. . . . He's been through a great deal of loss. In addition, Victor has struggled with mental health issue that, unfortunately, went undiagnosed for many years. I truly believe these struggles contributed to the situation that led to his incarceration."), attached as Exhibit C.

The South Bronx neighborhood where Victor grew up was – in the 1990s – a very dangerous and difficult place to be raised. His sister writes how in the neighborhood, "young men were often forced to prove their toughness just to get through school safely." *See* letter of Adara Shafe, attached as Exhibit D. As with many teenagers without a male presence in the home, Victor looked to older teenagers for "guidance," which as so often happens, led to his involvement in the criminal justice system. Victor was first arrested when he was 17 years old, and has been incarcerated a number of times.

Despite these challenges, Victor has been a loving and generous member of his family and community. He is the father of a six year old girl and step-father to her older sister. Their mother, Keicheera Corbett writes: "Victor and I share children together but aside from that we've been best friends for over 20 years. . . . Victor has always been one of the most sincere people I've ever known. He genuinely cares about people and people care about him. . . . My children have always had a strong bond with their father, and they look to him for support, guidance, and reassurance." *See* Exhibit E. As all of the letter writers describe, Victor is devoted to others:

- *Jessica Montanez* (sister): Over the years, Victor has continued to support me and my son in countless ways. He has picked my son up from school when I needed help, assisted him with homework and school projects, and been a positive reliable presence in his life. . . . Victor is not only a

---

[2] [redacted]

devoted brother – he is also an incredible father. His daughter means the world to him. *See* Exhibit C.

- *Christopher Gaynair* (friend): Despite the mistakes he has made in his life, I know [Victor's] a good person. He's hardworking, trustworthy, loyal and most importantly a very active hands-on father to his daughter. *See* Exhibit E.

- *Denise Hernandez* (family friend): Victor has the ability to continue making positive contributions to his daughter's life and to society as a whole. He has demonstrated resilience, responsibility, and growth. *See* Exhibit F.

- *See* also letters of Sabrina Williams and Yasheka Nadal, attached as Exhibits G and H, respectively.

Victor was arrested in connection with this case on October 26, 2023, and after spending several months at Rikers Island, was transferred to the Metropolitan Detention Center on January 9, 2024. As courts have repeatedly recognized, those confined at the MDC during this period experienced extraordinary deprivations. Judge Furman's *Chavez* opinion was filed the same week that Mr. Montanez was transferred to the MDC, and its descriptions of the horrific conditions at the facility were sadly prescient in connection with what Mr. Montanez endured. *See United States v. Chavez*, 710 F. Supp. 3d 277 (S.D.N.Y. 2004) (describing how, among other things, "the MDC is notoriously and, in some instances, egregiously slow in providing necessary medical and mental health treatment to inmates—especially where such care requires the attention of outside providers.").

In early March 2024, Mr. Montanez began complaining about severe abdominal pain and that he was losing weight at an alarming rate. It took a concerted effort to get Mr. Montanez necessary medical attention, and it took three months before he was appropriately diagnosed with Stage 4 non-Hodgkin lymphoma. *See* letter of Martin Cohen dated June 12, 2024 (filed under seal). By the time Victor entered the hospital, he had lost over 30 pounds in three months. His mother writes: "The first time I saw my son at Brooklyn Hospital, I initially thought he would die, He lost a substantial amount of weight and was unrecognizable." *See* Exhibit B.

Mr. Montanez was fortunate, though. He was transferred to Mt. Sinai hospital, where he receiving chemotherapy and other treatment, and where his condition slowly improved. By November 2024, Mr. Montanez's cancer was in remission, and accordingly he was returned to the MDC. The hospital staff was concerned that the MDC was not a suitable environment for someone who had a compromised immune system and was recovering from this type of cancer and cancer treatment. And not long after his return to the MDC, a new malignant tumor developed. In around January 2025, Mr. Montanez was returned to the hospital to receive even more intensive chemotherapy and cell therapy. He was returned to the MDC in April 2025, and

as far as we know, his cancer is currently in remission. *See* Exhibit K (excerpts from medical records).

Despite the brutality of the MDC (since *Chavez* was written, at least two inmates were murdered, and others have been stabbed), Victor has done everything he can to use his time as productively as possible. In particular, he has thought through, and spoken with friends and family about the terrible choices he has made in the past, his experiences while incarcerated, his guilt and remorse, and his struggles with a potentially terminal illness. *See generally* letter of Mr. Montanez, attached as Exhibit A. Victor has also contacted the Fortune Society for vocational assistance and other services to assist him in his reentry. *See* letter of Sherry Goldstein (offering "reasonable assurance" of employment upon release), *see* Exhibit O. His friends and family have seen significant change:

- *Adara Shafe* (sister): I have spent my professional career working with young people who struggle with trauma, identity, and survival in the same types of neighborhoods we grew up in. I share that to say this: I know the difference between someone who is unchanged and someone who has grown. Victor has grown. He has learned painful lessons, he has matured, and he sees life differently now, especially after fighting cancer and facing the possibility of not being here to watch his daughter grow up. *See* Exhibit D.

- *Rebecca Rodriguez* (mother): During his hospitalizations, Victor began reading the bible, and he would share with me the passages and lessons that brought him peace and strength. Today, the man before you is not the same young man who made mistakes in his past. . . . In conversations with my son, he has taken full responsibility for his actions and expresses deep remorse. He fully understands that his behavior created hardship not only for the community and himself, but also for his family – and most importantly, for his daughters. *See* Exhibit B.

In sum, Mr. Montanez's background and characteristics strongly support the requested sentence. His family is eagerly awaiting his release, and is prepared to support him in every way possible.

Re: *United States v. Victor Montanez*, 24 Cr. 12 (VM)

**B. Objections and clarifications to the Presentence Report.**

Nothing in these objections or clarifications are meant to minimize the seriousness of Mr. Montanez's conduct.[3]

1. *Page 1 and Paragraph 47*: Mr. Montanez's date of birth is June 26, 1990.

2. *Paragraph 5*: Several aspects of paragraph 5 should be re-worded to more accurately describe the events of October 26, 2023. Specifically, the primary evidence of the shooting is surveillance video, which shows Mr. Montanez firing a weapon the direction of a group of men who were around 150 feet away at the time and running in the opposite direction. We thus object to the editorializing language in the description (*e.g.*, Mr. Montanez shot "at" a group of men and "missed his intended targets"). In addition, the language used to describe the injuries to the innocent bystander, while perhaps technically accurate, suggest that the victim was more seriously injured than he was (*e.g.*, "The bystander survived his injuries."). NYPD reports and other discovery indicate that the bystander was "grazed" by a bullet, went on his own to the hospital, and was treated and released that same day. We thus respectfully request that paragraph 5 be replaced with the language below:

   - On October 26, 2023, at approximately 3:22 p.m., Victor Montanez fired at least three shots in the direction of a group of men behind 304 E. 156th Street in the Bronx. One of Montanez's bullets grazed an innocent bystander in the ear and cheek as the bystander was getting out of his car. The bystander was treated at a local hospital and discharged that same day.

3. *Paragraph 52*: Mr. Montanez resided with his sister Jessica and nephew (and not with Adara).

4. *Paragraph 57*: The PSR describes Mr. Montanez's very serious medical condition in terms that do not – in my view – communicate to the Bureau of Prisons how serious his condition is. I respectfully request that the Court replace paragraph 57 with the following language:

   - Mr. Montanez was diagnosed with Stage 4 non-Hodgkin lymphoma in May 2024. He was treated at Mt. Sinai Hospital, where he remained until around November 2024, when he was returned to the MDC. In January

[3] On November 13, 2025, the draft Presentence Report was prepared, and on November 24, 2025, I submitted objections and clarifications to the Probation Office. These objections and clarifications were not included in the final Presentence Report, which was revised on December 19, 2025.

2025, a new malignant tumor was discovered, and Mr. Montanez was returned to Mt. Sinai for intensive chemotherapy and cell therapy. Mr. Montanez was returned to the MDC in in April 2025. Mr. Montanez's lymphoma is currently in remission, but his long-term prognosis is uncertain.

5. *Paragraph 58:* We respectfully request that the sentence "The defendant could not recall if he was prescribed or administered any mental health medication," be replaced with: "Mr. Montanez recalls that he was prescribed mental health medication, but does not recall which medication it was."

6. *The appropriate enhancement under 2K2.1 is a four-level enhancement for using a firearm in connection with the felony offense of reckless endangerment in the first degree; the advisory Guidelines Range is thus 30 to 37 months.*

We object to the Probation Office's determination that, pursuant to U.S.S.G. §2K2.1(c), the cross-reference to the attempted murder guidelines apply. *See* PSR ¶ 15. We further object to the inclusion of a two-level enhancement because the victim did not sustain "serious bodily injury" as defined in the Guidelines. *See* PSR ¶ 16; U.S.S.G. §1B1.1, App. N. 1.(L).

Mr. Montanez's conduct was undeniably serious, incredibly reckless, and put other people at grave risk. Indeed, he injured an innocent passerby. Mr. Montanez's conduct did not, however, rise to the level of attempted murder because Mr. Montanez did not intend to kill anyone, and the Government cannot so prove. Instead, the most appropriate cross-reference for Mr. Montanez's conduct is the New York State offense of reckless endangerment in the first degree, where a person's conduct is so reckless that it poses a "grave risk of death" to others. Using a firearm in connection with this felony offense results in a four-level enhancement pursuant to U.S.S.G. §2K2.1(b)(6)(B), resulting in a total offense level of 15, and an advisory range of 30 to 37 months' imprisonment.

Federal law defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1119(a); *See United States v. Whiteside*, 207 F. Supp. 3d 311, 320 (S.D.N.Y. 2016). First degree murder "requires a willful, deliberate, malicious and premeditated killing." *Whiteside*, 207 F. 3d at 320 (quoting 18 U.S.C. § 1111(a)). Any other "murder" is second degree. *Id.*

Under Supreme Court and Second Circuit precedent, *attempted* murder under federal law requires the defendant to have specifically intended to kill his intended victim. *See Braxton v. United States*, 500 U.S. 344, 351 n.* (1991) (holding that while murder can be committed without an intent to kill, "an attempt to commit murder requires a specific intent to kill"); *United States v. Kwong*, 15 F.3d 189, 194 (2d Cir. 1994) (requiring specific intent to kill to convict for attempted murder); *United States v. Stroman*, 420 F. App'x 100, 105 (2d Cir. 2011) (holding that for the attempted cross reference under U.S.S.G. § 2A1.1(a)(2) to apply, the defendant must have acted with "specific intent" to kill his victim; *United States v. Stroman*, 498 F. App'x 67, 69 (2d

Cir. 2012) (same); *United States v. Ward*, 17 Cr. 171 (MPS), 2019 WL 6255198, at *3 (D. Conn. Nov. 22, 2019).

As district courts have repeatedly recognized in declining to apply the attempted murder cross-reference, "intent is obviously a difficult thing to prove," particularly when "it is heavily disputed." *United States v. Diaz,* 19 Cr. 65 (JMF), Dkt. No. 24, Tr. at 12 (S.D.N.Y. Aug 26, 2019). This is particularly true in cases like this, where the substantive offense of conviction does not require a finding of specific intent, either by the jury or in connection with a plea allocution. *See United States v. Jackson*, 351 F. Supp. 2d 108, 113-16 (S.D.N.Y. 2004) (declining to apply the attempted murder cross-reference, and explaining that finding "a person guilty of attempted murder . . . requires a detailed inquiry into the state of mind and circumstances" of the shooting.). As then District Judge Lynch observed, courts should be particularly wary of applying the significant sentencing enhancement for attempted murder when such a charge was never presented to a jury. *See id.* at 113, 116; *cf. In re Winship*, 397 U.S. 358, 364 (1970) ("the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). Even though the sentencing Guidelines are advisory, they continue to exert a strong gravitational pull. *See*, *e.g.*, Mark W. Bennett, *Confronting Cognitive "Anchoring Effect" and "Blind Spot" Biases In Federal Sentencing*," 104 J. Crim. L. & Criminology 489, 491 (2014) (explaining how the Guidelines-range can subconsciously influence judges to give greater weight to the Guidelines than to other important sentencing factors.)

Where a defendant fires a gun in close proximity to the victim, Courts frequently find the requisite intent to kill. *See, e.g., United States v. Norman*, 25 Cr. 213 (ER), *Government Sentencing Submission*, Dkt. No. 22 (S.D.N.Y. Dec. 31, 2025), citing *United States v. Barnes,* No. 23-6773, 2024 WL 4601465, at *1 (2d Cir. October 29, 2024) (defendant fired ten to fifteen rounds at close range); *United States v. Reid*, No. 22-1279, 2023 WL 8469353, at *1-2 (2d Cir. Dec. 7, 2023) (defendant fired a single shot "in very close range to his victim," *United States v. Atehortva*, 69 F.3d 679, 687 (2d Cir. 1995) (concluding that a district court could find intent to murder where there was "undisputed evidence that [the defendant] repeatedly fired a gun at federal agents from close range"); *United States v. Ashburn*, No. 11 Cr. 303 (NGG), 2015 WL 5098607, at *17 (E.D.N.Y. Aug. 31, 2015) (citing New York state cases which establish that "shooting a firearm at close range generally evidences the intent to kill, not seriously injure").

Conversely, recklessly firing in the direction of others from a significant distance does not evince an intent to kill another person. It is very serious conduct because a person *could* be killed, but it is different in kind from attempted murder. *See* N.Y. Penal L. § 120.25 (reckless endangerment in the first degree requires that, "under circumstances evincing a depraved indifference to human life," a person "recklessly engages in conduct which creates a grave risk of death to another person."); *see generally United States v. Legros*, 529 F. 3d 470, 474-475 (2d Cir. 2008).

For his part, Mr. Montanez does not recall the events of that afternoon, but the surveillance videos are wholly consistent with a finding of recklessness. One video shows

Mr. Montanez firing a weapon down the block. *See* Exhibit L (video still). At the time Mr. Montanez fired the weapon, the people running away from him were roughly 150 feet away. *See* Exhibit M (google map printout with measurements). In a second video, Mr. Montanez can be seen recklessly firing his gun in the direction of a person who was around 200 feet away and running. *See* Exhibit N, video still.

These videos show that Mr. Montanez acted in an extraordinarily reckless fashion, one which endangered many people, but the videos do not and cannot demonstrate by a preponderance of the evidence that Mr. Montanez acted with the specific intent to kill. *See*, *e.g.* *United States v. Escort*, 21 Cr. 387 (DLC) (holding that firing several shots at an individual and again at a passing car did not constitute attempted murder but rather reckless endangerment); *United States v. Cannonier*, 21 Cr. 674 (NRB) (finding reckless endangerment when defendant shot five times at passengers in a fleeing car); *United States v. Belmar*, 21 Cr. 16 (KMW) (same: defendant fired 6-7 times in the direction of rival gang members)*; United States v. Morrishow*, 23 Cr. 165 (CS), Dkt. No. 33 (government argued for reckless endangerment enhancement where defendant shot into basement apartment while an individual was inside and, while fleeing, fired three shots at his pursuer); *United States v. Lockhart,* 22 Cr. 179 (CS) (S.D.N.Y), Dkt. No. 28 (government argues for reckless endangerment enhancement where defendant returned fire multiple times in the direction of others on a residential street in Yonkers).

Here, Mr. Montanez acted with such recklessness that his conduct posed a grave risk to other people. In other words, he possessed a gun in connection with the commission of another felony offense; specifically, reckless endangerment in the first degree. If the Court finds, however, that Mr. Montanez acted with the specific intent to injure someone (as opposed to attempted murder), the appropriate alternate cross-reference is to aggravated assault, under U.S.S.G. §2A2.2, which would result in an advisory range of 46 to 57 months.[4]

If the Court ultimately finds that the advisory Guidelines should be calculated under U.S.S.G. § 2A2.1, it should nevertheless decline to include a two-level enhancement for "serious bodily injury." Under the Guidelines, serious bodily injury is defined as "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." *See* U.S.S.G. §1B1.1, App. N. 1.(L). We have not been provided with any evidence suggesting that the victim here suffered such an injury.

### C. A sentence of no more than 40 months' imprisonment will best satisfy all of the purposes of sentencing.

---

[4] Calculated as follows: A base offense level of 14, pursuant to § 2A2,2; a five-level enhancement for discharging a firearm, pursuant to § 2A2.2(b)(2); a three-level enhancement for causing bodily injury, pursuant to § 2A2.2(b)(3)(A); a three-level reduction for acceptance of responsibility, pursuant to §3E1.1, resulting in a total offense level of 19.

Regardless of the Court's determination of the advisory Guidelines range, a sentence of no more than 40 months' imprisonment will best satisfy all the purposes of sentencing.

*Punishment:* As of this writing, Mr. Montanez has been incarcerated for 27 months, both at Rikers Island and the MDC. These are extraordinarily difficult, extra-punitive facilities, where Mr. Montanez experienced severe deprivations and, where despite his complaints about severe pain, it took *months* before Mr. Montanez received the appropriate level of medical care.

*Deterrence:* Extensive incarceration is not necessary to specifically deter Mr. Montanez. The last 27 months of brutal incarceration while fighting a potentially terminal illness has fundamentally changed Mr. Montanez: "I can now say I look at my life totally differently. I know I don't have a choice in this matter and must pay for the things I did. If I did have a choice, I would spend the rest of my days being a father and the man I know I could be." *See* Exhibit A. Incarceration is also not required for the purpose of general deterrence, "a phenomenon that is notoriously difficult (and perhaps impossible) to measure," see *United States v. Brady*, 2004 WL 86414, at *9 (E.D.N.Y. Jan 20, 2004). Evidence-based studies strongly support the conclusion that it is the *certainty* of being prosecuted rather than the severity of punishment that deters crime. *See* Nat'l Inst. of Just., *Five Things About Deterrence*, available at http://nij.gov/five-things/pages/deterrence.aspx.[5]

*Incapacitation*: Mr. Montanez does not need to be incapacitated. His community will be far better served by his returning to his family, providing crucial emotional support to his daughters, and receiving necessary medical and mental health care.

*Rehabilitation*: Despite the initial delays in treatment, Victor was fortunate in that he was ultimately sent to a hospital which properly diagnosed him and where he received appropriate care. This stands in stark contrast to other clients of our office, both here and nationwide. *See*, *e.g.*, *United States v. Terrence Wise*, 23 Cr. 9 (DG) Dkt. Nos. 24, 28, 52 (E.D.N.Y.) (describing egregious delays in diagnosing and treating defendant at the MDC, who subsequently died of cancer); *United States v. Frederick Bardell*, 634 F. Supp. 3d 1083 (M.D. Fla. 2022) (describing how the court initially denied defendant's motion for compassionate release based on misinformation provided by the Bureau of Prisons; how when it subsequently did grant the motion for compassionate release, the BOP failed to comply with the terms of the release order; and how the defendant died shortly thereafter from an otherwise treatable illness: "With timely diagnosis and treatment, [defendant's] attesting physician assessed his chances of survival at 71%."); *see also* DOJ OIG, *Investigation and Review of the Federal Bureau of Prison"*

---

[5] The National Institute of Justice describes the "Five Things" series as a distillation of "what we know from years of rigorous scientific inquiry," summarizing an "abundance of research, analysis, testing and evaluation." *See* Nat'l Inst. Just., *NIJ "Five Things" Series*, available at: http://nij.gov/five-things/Pages/welcome.aspx.

*Conditions of Confinement and Medical Treatment of Frederick Mervin Bardell and Related Representations to the Court* (January 2026).[6]

The inability of the Bureau of Prisons to provide effective medical and mental health care has been exhaustively documented, including by the Department of Justice. *See*, *e.g.*, DOJ Office of the Inspector General, *Inspection of the Federal Bureau of Prisons' Federal Medical Center Devens*, at i (Dec. 2024) (conducting an unannounced inspection of one of the few dedicated medical facilities in the Bureau of Prisons system, which revealed substantial staff shortages jeopardizing care, including that "the medical institution had only 1 physician and the Clinical Director (who is also a physician) to manage the care of the entire inmate population of approximately 941 inmates.").[7] As recently described in the amicus brief of former high-level BOP officials:

> Across BOP, limited funds, inadequate staffing, and an aging inmate population leave healthcare capabilities "strained" (as a report recently commissioned by BOP itself put it). This strain undermines safe, secure, efficient, and humane operations throughout BOP. Overstretched healthcare staff are forced to prioritize medical crises that consume more time and resources and leave less acute problems to fester until those problems turn into new medical crises.

*Johnnie Markel Carter v. United States*, No. 24-860, *Brief Amici Curiae Former Bureau of Prisons Officials* (March 13, 2025);[8] *see also* Letter of Senator Dick Durbin, dated January 14, 2025 ("[U]nderstaffed federal prisons cannot ensure the safety and wellbeing of the incarcerated individuals in their care or adequately provide necessary services for them, including critical medical and mental health care. Additionally, due to staffing shortages, BOP facilities are assigning noncustodial staff, such as teachers, case managers, and medical staff, to perform routine correctional officer duties.");[9] NPR, *Lawmakers Push For Federal Prison Oversight After Reports of Inadequate Medical Care* (Dec. 12, 2023) (describing an NPR investigation that

---

[6] Available at: https://oig.justice.gov/reports/investigation-and-review-federal-bureau-prisons-conditions-confinement-and-medical

[7] Available at https://tinyurl.com/383a932t.

[8] Available at: https://www.scotusblog.com/cases/case-files/carter-v-united-states-2/

[9] U.S. Senate Committee on the Judiciary, *Durbin Urges OPM To Approve Special Pay Rate for BOP to Address Critical Staffing Shortages at BOP Facilities Nationwide* (Jan. 14, 2025), available at: https://www.judiciary.senate.gov/press/dem/releases/durbin-urges-opm-to-approve-special-pay-rate-for-bop-employees-to-address-critical-staffing-shortages-at-bop-facilities-nationwide

Re: *United States v. Victor Montanez*, 24 Cr. 12 (VM)

detailed numerous accounts of federal prisoners nationwide going without needed medical care, and finding that at least 4,950 people had died in BOP custody in roughly the last decade).[10]

Victor's lymphoma requires careful monitoring and treatment; he also requires intensive and supportive mental health treatment. Mr. Montanez will receive such treatment while on supervision, but will not receive such treatment while incarcerated. Here, the need for the sentence imposed to provide medical care in *the most effective manner* strongly militates towards imposing a shorter incarceratory term. *See* 18 U.S.C. § 3553(a)(2)(D).

* * *

As I've reiterated throughout this submission and as Mr. Montanez recognizes, his conduct here was very serious. But for the reasons described above, there are countervailing considerations which strongly support prioritizing supervision over incarceration. Here, a sentence of 40 months' imprisonment, with conditions of supervised release including intensive mental health treatment, will best satisfy *all* the purposes of sentencing.

Respectfully submitted,

/s/______________________

Martin S. Cohen
Ass't Federal Defender
Tel.: (646) 588-8317

Cc. Dominic Gentile, Esq. by ECF and e-mail

---

[10] Available at: https://www.npr.org/2023/12/12/1218627629/lawmakers-push-for-federal-prison-oversight-after-reports-of-inadequate-medical-

# Exhibit A

Dear Judge Marrero,

First, I would like to thank you for allowing me to write this letter. I would like you to know that even though I have no recollection for what transpired that day, I take full responsibility for my actions.

Upon release from my last incarceration, I managed to stay home for five years. Within that time, I tried to further my education, worked various jobs, came out with my own clothing line, and most importantly created a beautiful family. I have two daughters, my eldest is not mine biologically but I love her like she's mine. Her name is Kendall Logan, she turned fourteen yesterday, and my youngest is Kaylee Montanez, and she's six.

I have made a lot of mistakes in my life, but this is by far my biggest. I want to apologize to the people I harmed, and to my kid's mother for leaving her out there to take care of my beautiful girls by herself. I'm not perfect, and there's no way to express the regret that I feel for what I did and for not being a part of my family's lives the last two years. My baby asked me if I would be there for her sixth birthday, and I had to tell her "I don't know", the first lie I've ever told her. These are memories that I can't erase, and I just pray that my girls don't resent me for not being there. I've missed graduations and birthdays, the best I can do is try to make it up to them when I'm free.

I've been in maximum security prisons, and I can truly say that MDC has taught me my biggest lesson. MDC is by far the worst place I have ever bene. Prior to my incarceration I was battling mental health issues, and I was admitted to the hospital and put on medications. MDC is neglecting my medical needs. I've been in here two years and only seen a physiatrist once. I've also been battling cancer. I was diagnosed with lymphoma, and have been complaining about severe abdominal pain since February of 2024. I didn't get diagnosed with stage 4 cancer until the end of May, 2024. If it wasn't for my unit counselor Ms. Hicks, I probably would have died due to their neglect. For her, I am forever grateful.

I've overcome cancer twice. I don't want to die in jail. I can now say I look at life totally different. I know I don't have a choice in this matter and that I must pay for the things I did. If I did have a choice. I would spend the rest of my days being a father and the man I know I could be. If you give me the chance to go home to my family while my kids are still young, you will never see my face again. I made a promise to myself that I will never leave my family again and I intend to keep it.

Thank you for your time your Honor.

Sincerely,

Victor Montanez

# Exhibit B

Rebecca Rodriguez

Honorable Victor Marrero
United States District Judge
Southern District of New York

Re: Letter of Support for Victor Montanez

Dear Judge Marrero,

My name is Rebecca Rodriguez, and I am the mother of Victor Montanez.
I write to you today not only as his mother but as someone who has witnessed his struggles, his growth, and his unwavering love for his family.

Victor was born on June 26, 1990, to my biological aunt, Mabel Echevarria, who struggled with medical and mental health issues and drug addiction. Sadly, Victor was also born with similar medical and mental concerns as his biological mother. Victor was raised by our biological grandmother, who cared for seven other grandchildren, including myself. From the moment I saw him, I fell in love—he was the cutest baby I had ever seen.
As a teenager, I naturally assumed responsibility for Victor, as our grandmother was elderly and already caring for many children. After her passing, I petitioned the court and was granted full custody of him. We continued to live in the South Bronx, where I still reside today.

As a child, Victor did very well in school. I still have his test papers to this day.
He was well-behaved both at home and in school. I maintained a strict household while always emphasizing the importance of education—a value instilled in us by my grandmother, who was illiterate but always told us, “Make sure you get an education. That is something no one can take from you.”

At home, Victor was a happy child—always smiling, joking, listening to music, and drawing. He is an amazing artist with a natural gift. As Victor entered his teenage years, I began to see his behavior shift in ways that concerned me. He started spending time with the wrong crowd and displaying behaviors that did not reflect the way he was raised.

Wanting to guide him back onto a positive path, I enrolled him in the Big Brother program, signed him up for after-school programs, karate, and any other activities I felt might interest him or help him stay focused, to no avail. Hoping a change of scenery and friends will get him back on track Victor went to live his older sister Denise Echevarria. Unfortunately, despite our families collective effort, Victor's behavior did not improve and at times he found himself in trouble.

As a young boy, Victor experienced many challenges—medically, mentally and emotionally. He was diagnosed with ADHD, seizures and a host of other medical concerns. He endured the loss of our grandmother and grandfather, who were the only parental figures he truly knew, along with the loss and absence of his biological mother. Additionally, Victor struggled with an undiagnosed mental health concern, which affected his behavior and emotional development.

Your Honor, I want to be clear that this is not an excuse for Victor's actions, as he is now an adult who understands accountability. However, these early struggles deeply affected him and shaped much of the emotional challenges he carried into his later years.

During his incarceration, Victor has battled cancer twice. Victor requested the Bureau of Prisons take him to the hospital as he was feeling ill and that request was ignored several times. They even threatened him by stating they would put him in isolation for causing trouble. The first time I saw my son at Brooklyn Hospital, I initially thought he would die. He lost a substantial amount of weight and was unrecognizable. This was not the man that entered into Bureau of Prisons custody. I remember going home that day and telling my daughter, I don't think your brother is going to make it, I need to start making funeral arrangements.

Victor was then transferred to Mt. Sinai Hospital, and although I started to see progress, the BOP made it extremely difficult for my family and I to provide Victor the support he needed. It was a tedious procedure, arrangements needed to be made either daily or weekly, whichever, procedure they decided to follow on any given day. At times I believed that they didn't not know their own procedures. BOP also cancelled visits mid-way, depending on which supervisor would stop by. The mother of his child was unable to visit due to not being an immediate family, causing me to either miss work or leave early as I was responsible for taking his daughter on visits.

As current as today, Victor's chemotherapy port was removed, and he believes a part is still in him. However, despite his request for medical help he has not been taken to the hospital

and often complains of pain. I strongly believe BOP is not able to provide the proper medical attention that is needed.

During his hospitalizations, Victor began reading the Bible, and he would share with me the passages and lessons that brought him peace and strength. Today, the man before you is not the same young man who made mistakes in his past. Victor is the father of a 6-year-old daughter, Kaylee, and a devoted step-father to 13-year-old Kendall, whom he loves and cares for as his own. He is a loving and committed father. The separation has been especially painful for Kaylee, who often cries because she wants her father home, and she doesn't quite understand what is going on.

When Victor is allowed to come home, he will have the full support of his family.
He will reside with his sister, Jessica Montanez, with whom he lived prior to his incarceration. Furthermore, he has secured services through the Fortune Society, which is assisting him with mental health counseling, drug treatment, job readiness, employment placement, and housing support if needed.

Victor will have the full support of his family—emotionally, physically, and financially.
Prior to his incarceration, he started his own urban clothing line. We will assist him in establishing his LLC, which will help him support his family and continue on the path to becoming a law-abiding, productive member of society.

In conversations with my son, he has taken full responsibility for his actions and expresses deep remorse. He fully understands that his behavior created hardship not only for the community and himself, but also for his family—and most importantly, for his daughters. I honestly believe upon his release he will put his best foot forward to be the best man he can be.

Your Honor, thank you for your time and attention to this matter.

Respectfully,

Rebecca Rodriguez

# Exhibit C

**November 23, 2025**

**Dear Judge Marrero,**

My name is Jessica Montanez, and I am the older sister of Victor Montanez. I am writing this letter in support of my brother, whom I love deeply. Before his incarceration, Victor lived with me, and during that time and throughout our entire lives he has consistently shown himself to be a caring, loving, and dependable person.

When I was pregnant with my son, I was considered high-risk. Victor stood by my side every single day. He checked on me constantly, making sure I was eating, resting, and never needed anything. Those moments showed me the depth of his heart and the kind of man he truly is.

Over the years, Victor has continued to support me and my son in countless ways. He has picked my son up from school when I needed help, assisted him with homework and school projects, and been a positive, reliable presence in his life. These are just a few examples of the compassion and commitment he naturally shows to the people he loves.

Victor is not only a devoted brother—he is also an incredible father. His daughter means the world to him, and I know with absolute certainty that under a sound mind, he would never intentionally do anything that would jeopardize being in her life.

Victor has overcome many challenges since childhood. He suffered from serious health issues as a young boy. We also lost our mother at a young age, our grandmother and grandfather which profoundly impacted him. He's been through a great deal of loss. In addition, Victor has struggled with mental health issues that, unfortunately, went undiagnosed for many years. I truly believe these struggles contributed to the situation that led to his incarceration.

His absence has taken a significant emotional toll on him and on our entire family. Before this, Victor had shown great potential and determination. He was an entrepreneur with a clothing brand called *Legendary*, which he designed and promoted himself. His creativity and ambition were evident, and his work was beginning to gain real traction.

Once Victor is released, I plan to continue supporting him in rebuilding his life and his future. I will help him relaunch his clothing brand, secure an LLC, and create a website to professionally showcase and sell his designs. We have also discussed him going to school to study business, and I am fully committed to helping him achieve that goal.

Victor has always supported me, and I will continue to support him as he works to rebuild his life, be present for his daughter, and return to the caring, responsible man we all know him to be.

Thank you for taking the time to read my letter.

**Sincerely,**
**Jessica Montanez**

# Exhibit D

Your Honor,

My name is Adara Shafe, and I am the youngest sister of Victor Montanez. I am a school social worker and psychotherapist. For the last 5 years I have supported young people and their families through challenges related to trauma and mental health. I specifically work in the neighborhood Victor and I were raised in. I am here today to speak on behalf of my brother, Victor.

Victor and I were raised together in the Jackson Houses in the South Bronx. Growing up, he was always full of life; laughing, smiling, listening to music, and constantly surrounded by friends. Our mother was very strict with both of us. She demanded respect, expected us to do well in school, and did everything she could to give us a safe upbringing in our neighborhood.

But despite her efforts, Victor and I had very different experiences as children. As a young boy growing up in the projects during a time of gang violence. Victor faced pressures that he should not have had to worry about. In the environment we lived in, young men were often forced to prove their toughness just to get through school safely. There was an unspoken rule: if you weren't with a particular group, then you were against them. This is the reality for many young men growing up in one of the poorest congressional districts in the state, The South Bronx.

My mother tried her hardest to keep Victor away from the streets. When she saw him getting pulled in the wrong direction, she even had him live with one of our older sisters in a different neighborhood. At that time, he was only about 14 or 15 years old. What started as small mistakes, typical things teenagers might do, eventually grew into more serious trouble as he got older. That is a familiar story in neighborhoods like ours, where resources are limited, trauma is common, and positive male role models are almost nonexistent.

Victor has spent a significant part of his life incarcerated, and I believe this has affected him deeply. Yet even through all of this, he has always tried to be present for his family and now most importantly his daughter, my niece, who loves him dearly. To her, he is everything. She cries because she cannot call him, she cries because he cannot show up at her school events, and the impact of that separation affects her emotionally/ physically every day.

Victor has lived through a great deal of loss and trauma. PTSD and mental health struggles are very real issues for Black and Brown men in communities like ours, especially when they grow up surrounded by violence. Victor is also the only boy among six siblings, and the one male figure he had growing up, passed away early in his teenage years. After that,

Victor continued to turn to the streets for examples of what being a “man” looked like, because there was nowhere else to look too.

Now, Victor is a much older man. He has faced cancer while incarcerated, with very little support, and that experience changed him profoundly. He started reading the bible, and talking about God with my mother. It was a wake-up call, physically, emotionally, and spiritually. He understands the seriousness of his past decisions, and he carries deep remorse for the harm his choices have caused. I truly believe that the man standing before you today is not the same young man shaped by the trauma and pressures of his environment.

Your Honor, I have spent my professional career working with young people who struggle with trauma, identity, and survival in the same types of neighborhoods we grew up in. I share that to say this: I know the difference between someone who is unchanged and someone who has grown. Victor has grown. He has learned painful lessons, he has matured, and he sees life differently now, especially after fighting cancer and facing the possibility of not being here to watch his daughter grow up.

I believe my brother is capable of living a more meaningful life. I believe he is capable of being present for his daughter, for his family, and for himself. And I believe that he deserves the opportunity to show that the man he is today is not the boy shaped by the circumstances of our childhood.

Thank you, Your Honor, for taking the time to hear my statement.

Kind Regards,

Adara Shafe

# Exhibit E

Keicheera Corbett
December 1, 2025

Honorable Victor Marrero
United States District Judge
Southern District of New York

Dear Judge Marrero,

My name is Keicheera Corbett. Victor and I share children together but aside from that we've been best friends for over 20 years. He's honestly one of the best friends I've ever had and I miss him dearly. I am writing to you with respect and sincerity regarding his sentencing. I would also like to express the impact that this current situation has had on my children, Kendall and Kaylee.

Victor has always been one of the most sincere people I've ever known. He genuinely cares about people and people care about him. One thing I noticed when I met his family is that so many of his family members have a special love for him. It's as if he was so many of his family members' favorite person. Victor is a very honorable person, and I know this to be true. Our daughter, Kendall, isn't his biologically but he took on the role of being her dad so she wouldn't feel the void of not having one. He never treats her any differently than he does the daughter we share biologically. He's been in her life since she was 5 years old and she's 14 now. I didn't always do a good job expressing how much I appreciated him, but I've always appreciated Victor for doing that for her and I know she doesn't fully understand right now but I always express to her how blessed she is to have him in her life. Some people parents leave their lives and that's just it but she was blessed to have a backup dad. Someone who wanted to be her dad all out of the love that he grew for her. My children have always had a strong bond with their father, and they look to him for support, guidance and reassurance. Kendall doesn't express her feelings much but Kaylee does. She just turned 6 and she often feels sad about her dad not being around. She has moments where she cries and it sometimes takes me over an hour to get her to stop.

Victor played a big part in the upbringing of our children and since he's been away it's been much harder on me. Financially, physically and sometimes mentally. He's missed out on so much and I know our children feel that void of him not being around. I can honestly say I feel a void too because he was a huge support for me mentally and I often catch myself still leaning on him for that support and then I remember where he is and think of the headspace he might be in. He already carries a lot of guilt for the mistake he made that

placed us and himself in this position. I know he will never do anything to put us in this position again.

I want to thank you for taking the time to consider my perspective. Our family is ready to do whatever is necessary to support him when he is released, which I hope you can consider making sooner than later for the sake of my daughters.

Respectfully,
Keicheera Corbett.

# Exhibit F

Dear Judge Marrero,

My name is Christopher Gaynair. Victor and I have been friends literally all our life to the point where we even refer to each other as cousins when people ask. This lifelong friendship was planted way before both of us were even born due to our mothers being best friends and us two have stayed close through all these years.

I'm writing this letter in support of Victor because despite the mistakes he has made in his life, I know he's a good person. He's hardworking, trustworthy, loyal and most importantly a very active, hands-on father to his daughter. Victor and I have a very honest and straightforward friendship where we feel comfortable in voicing our opinions to one another. That sometimes leads to disagreements, but we know it comes from a place of love. We speak on the phone about twice a month and what stuck out to me the most is him taking full ownership for his actions and not trying to deflect blame on others for the situation he's in right now. I find that to be a huge step in maturing.

I'm a new first time dad and despite him being away Victor was one of the few people making sure to check in on me while also giving me helpful advice on how to navigate fatherhood. About 75% of our conversations are centered around him being eager to get back to society so he can continue being the great dad to his daughter and make up for the time missed with her because his presence is very imperative in her life.

With that being said, I believe with the right mindset and support Victor can return to being a positive member of society. I am also committed to standing by his side and helping in anyway I can with his transition coming home.

Respectfully,

Christopher Gaynair

# Exhibit G

Dear Judge Marrero,

I am writing this letter on behalf of Victor Montanez, whom I have known since he was a young child. Over the years, I have had the privilege of watching him grow into a caring, responsible, and respectful individual.

Victor is a devoted father to his daughter, and it is clear that his role as a parent is at the center of his life. He provides her with love, guidance, and stability, and he works hard to be a positive role model for her. His dedication as a parent speaks volumes about his character and values.

I recognize that Victor, like all of us, has faced challenges and made mistakes. However, I have always known him to be someone who learns from his experiences and strives to move forward in a better direction. He is compassionate, hardworking, and committed to being a supportive member of his family and community.

I sincerely believe that Victor has the ability to continue making positive contributions to his daughter's life and to society as a whole. He has demonstrated resilience, responsibility, and growth, and I respectfully ask that you take this into consideration.

Thank you for your time and for allowing me to share my perspective on Victor's character.

Respectfully,
Denise Hernandez
Family Friend

# Exhibit H

Dear Judge Marrero,

I am writing this letter on behalf of Victor Montanez, whom I have had the privilege of knowing since birth. Victor comes from a good, supportive, and hardworking family, and I have seen firsthand the strong values that were instilled in him growing up.

Like many people, Victor has faced challenges and made mistakes in his life. What makes him stand out, however, is the way he has taken responsibility for his actions. He has acknowledged those mistakes and is actively working to learn and grow from them. His accountability speaks to his character and his determination to do better moving forward.

Victor has so much potential to be a law-abiding, contributing member of society. He deeply desires the opportunity to return home and continue being an active and positive presence in his family's life—as a devoted parent, a caring brother, a loving uncle, and a supportive son. Family is at the core of who Victor is, and I believe that with the right opportunity, he will use his experiences to guide him toward a better future.

I truly believe in Victor's ability to rebuild his life and create a brighter path ahead. He has shown the willingness to change, the humility to accept responsibility, and the love for his family that will motivate him to succeed. I respectfully ask that you take these qualities into consideration when making your decision.

Sincerely,
Sabrina Williams

# Exhibit I

Yasheka Nadal

August 29, 2025

Dear Judge Marrero,

I am writing this letter on behalf of Victor Montanez, whom I have know since he was a very young child. From the beginning, I have known Victor to be a sweet, caring, and compassionate individual who truly values the people in his life.

While Victor has made mistakes, as many young people do, he has shown great responsibility in learning from those experiences and working to improve himself. I firmly believe that these experiences have only strengthened his sense of responsibility and his desire to grow into a better person.

Victor is also a wonderful father. He cares deeply for his child and works hard to provide love and support. His dedication to his family is a true reflection of his character and the man he strives to be.

Thank you for taking the time to consider my perspective. I have every confidence that Victor will continue to move forward in a positive direction.

Sincerely,

Yasheka Nadal

# Exhibit J

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

[redacted]

# Exhibit K



# Exhibit L

Google Maps

E 153rd St & Courtlandt Ave




Imagery ©2025 , Map data ©2025 Google 20 ft

# Exhibit M



Exhibit N

The Fortune Society
*BUILDING PEOPLE, NOT PRISONS*

29-76 Northern Blvd
Long Island City, NY 11101
tel. 212.691.7554
fax. 347.510.3451
www.fortunesociety.org

9/18/2025

Mr. Victor Montanez # 93952510
MDC Brooklyn
Metropolitan Detention Center
P.O. Box 329002
Brooklyn, NY 11232

RE: Letter of Reasonable Assurance

Dear Mr. Montanez:

Thank you for your interest in The Fortune Society. Our Employment Services Unit can assist you in your job search upon your release, through service and/or referral. Although this letter is not a guarantee of employment, you may present this letter to your parole officer as our offer of "reasonable assurance" of employment.

**Free Services Offered by the Fortune Society**

- Alternatives to Violence and Anger Management through our Alternatives to Incarceration (ATI) programs
- Family Services (Parenting Training and Legal Support regarding Custody, Visitation and Child Support issues)
- Educational Services (Basic Reading and Math, GED Preparation, ESOL and Computer Training)
- Employment Services (In-house Training, Placement and Retention Services and/or Referral)
- HIV/AIDS Services (Testing, Peer-Education Training, Case Management, Supportive Counseling, Treatment Adherence, and Prison/Jail Discharge Planning)
- Outpatient Substance Abuse Treatment Services
- Assessments and Referrals for appropriate medical and mental health care
- Narcotics Anonymous (NA) meetings (TBD)

We also operate a 450-bed transitional housing program and can provide emergency housing to a limited number of individuals who, after release, are determined eligible for placement. However, due to space limitations, we cannot offer a guarantee of housing nor can we offer you a permanent address.

**Getting to The Fortune Society**
Our offices are located at 29-76 Northern Boulevard, Long Island City (entrance north side of building). Take the E, M, R subway trains to Queens Plaza, 41st Avenue exit (head toward 40th Road) or the N, Q, 7 subway trains to Queensboro Plaza, Bridge Plaza (head east on Queens Plaza to Northern Blvd.).

**When Should You Arrive and What Should You Bring**
You may visit our Centralized Admissions Unit Monday through Thursday, between the hours of 8:30 am and 10:00 am, for an intake assessment. Counselors will meet with any client who requires immediate crisis intervention throughout the day Monday through Friday. You may also set up an appointment by calling Nancy Lopez, Director of Centralized Admissions, at 212-691-7554. When you do plan to visit the Fortune Society, please remember to bring your release papers, as well as any other identification you may have. Also, if available, please bring a copy of your most recent medical documentation.

Finally, you can receive a free copy of The New York's Public Library's "*Connections, a guide for formerly incarcerated people in New York City"*, by sending a request to: NYPL Correctional Services, 445 Fifth Avenue, New York, NY 10016.

We wish you much success and look forward to working with you to help you attain your goals.

Sincerely,

Sherry Goldstein
Vice President, Agency Operations